## Case No. 7,541.

### The JOSEPH H. TOONE.

[Blatchf. Pr. Cas. 223.] [1]

District Court, S. D. New York. Oct., 1862.[2]

[1] [Reported by Samuel Blatchford, Esq.]
[2] [Affirmed in Case No. 7,543.]

BUTTS, District Judge. Although the issue in this suit was taken under formalities manifesting preparations for a formidable contest on the trial, the case was finally heard on the attendance of counsel for the libellants only, with the privilege allowed by the court to the counsel for the claimant of the vessel and the several claimants of the cargo to file briefs in their behalf on the next day. The first libel was filed November 19, 1861. After a short delay, permitted by the court, the answers and claims of the owner of the vessel, for himself as to the vessel, and in the capacity of agent for several parties, Spanish subjects, residents within the Spanish dominions, for the whole cargo, and the further sole answer in full of one of those claimants personally for a portion of the cargo, were filed on the 31st of December thereafter. The libellants obtained an order of court authorizing the libel to be amended, April 26, 1892; and on the same day filed an amended libel in the suit against the vessel and cargo. But the warrant thereon was issued against the cargo alone, and no arrest of the vessel in the suit has been returned by the marshal to the court. No further answer was interposed by the claimants; but since the hearing, by permission of the court as above noted, a brief or note of objections was filed to the action on the merits, by way of argument. The vessel and cargo were seized as prize, October 1, 1861, in the Gulf of Mexico, between Timbalier Island and the southwest pass of the Mississippi river, and south of Barataria Bay, by the United States war steamer South Carolina. The vessel was, it seems, on capture, detained for the use and service of the government, but, she not being included in the process or its return, no decree can be rendered against her in this action. The cargo was transshipped and sent in another vessel to this port for adjudication. The alleged owner of the vessel, her master, two seamen, and a passenger, all taken on board, were also sent here, and were examined in preparatorio. The papers found on board of the vessel are voluminous, but most of them will be passed by without detailed notice, as they have no special bearing upon the judgment now rendered, and most of them relate to transactions and voyages anterior to the war, or the establishment of a blockade of the Southern ports in question. The papers exhibit no other title in Aymar, the claimant to the vessel, than her provisional register in his name, in the British consulate, dated the 25th of September, 1861,

and the execution by him on the same day, at the same place, and before the same officer, of a power of attorney to Pennington, the master of the vessel, as his agent, to manage and sell the vessel for him, and in his name. Aymar testifies, in his examination in preparatorio, that he bought the vessel from Pennington, the master, in September, 1861, who gave him a bill of sale of her, as attorney of Thomas Flood, a British subject; but no bill of sale is produced in evidence, nor any proof of the payment of the consideration price therefor; and the circumstances indicate that the act of passing the title to Aymar, and his power to dispose of it over, were simultaneous, and in furtherance of a common purpose, whether that be a lawful or illicit one in relation to this country. The vessel was of American build, and at what time she assumed a British character is not shown, otherwise than as above stated. Aymar swears that he is a British subject by birth, and that he is unmarried, and has resided and been in business in New Orleans for eight years. The contrary not being alleged, it will be presumed that his residence and business relations in New Orleans directly preceded his obtaining title to the vessel and appointing the master. He says that he had known the vessel for six months, and had known about her for at least eighteen months previously. Though not directly declared in the testimony, the inference is strong that Aymar accompanied the vessel on her voyage out to Havana, for he says that she cleared at New Orleans to sail from Berwick City, in Louisiana, which place she left August 25th or 27th for Havana, in Cuba; and Monsall, the steward, says that he first saw Aymar, who came on board the vessel, at Berwick Bay, whence she sailed on her voyage to Havana. The master testifies that she left Berwick for Havana on the 27th of August, and that on the voyage prior to the last one she went from Havana to Berwick Bay. The owner and the master, both of them, knew of the war between the Confederate States and the United States, and that the Louisiana ports were under blockade, before and at the time this and the last voyage were undertaken. The voyage from Havana commenced on the 27th of September. The capture was made October 1st, in the evening, at a point supposed to be 35 or 40 miles off the Louisiana coast, and, upon some of the representations of the locality, between the island of Timbalier and the mainland off and south of Barataria Bay. No log was found on the vessel at her capture, and no account is given, in the proofs, respecting its suppression or existence. As geographical facts, the place of the vessel's departure and the place of her declared destination were on about the same parallel of latitude, Havana being about 23° north latitude, and Tampico, named in the manifest and shipping articles as the port of destination, differing but a few minutes from the latitude; whilst the place of capture was in the vicinity of the outlet of the Mississippi river, and on a line nearly equidistant from Havana and Tampico. As given on ordinary maps and charts, Havana, the starting point, is in latitude 23° 9' north, and longitude 82° west, and Tampico is in latitude 22° 40' north, and longitude 92½° west, so that a direct line from the former to the latter would tend with a slight angle south of west; but the course from Havana, in latitude 23° 9' north, to bring the vessel to Timbalier Island or Barataria Bay, in latitude 28° north, and longitude 90° west, must necessarily be largely north of west, and be, in length, a distance almost as great as the distance, on a direct course, between Havana and Tampico. The master, in his testimony, says that his course from Havana to the place of capture was northwest. The statement of the relative distances and bearings might be noted with more exactness from accurate sea charts, if at hand, but these estimates are sufficiently precise to suggest the just influence of those facts upon the questions to be considered by the court. The manifest and bills of lading found with the vessel on her capture showed her to be laden with various military stores and equipments, arms and ammunition, contraband of war, together with a general cargo of merchandise.

The defence to the suit is that the vessel and cargo were neutral property, cleared and intended for a neutral port, and on their direct passage to that port, and were in no way designed for a blockaded port, or one in possession of enemies of the United States. The United States do not controvert the allegation that the cargo was neutral. They question the integrity of the transfer of the vessel to the claimant Aymar, at Havana, and deny that the cargo was honestly obtained for a neutral voyage by the claimants, or was intended to be sent to a neutral port, but, on the contrary, assert that it was destined for a blockaded port, and was to be delivered to the enemies of the United States. The answer and claim was, in the first place, interposed for Aymar, in his own right, to the vessel, through his proctor, and for the cargo, in behalf of various of its shippers. A subsequent answer was, by leave of the court, filed in behalf of other consignees of the cargo, on the 28th of April, 1862. Appended to these papers were long protests and allegations, setting forth irregular and oppressive conduct of the captors, exercised by them in making the capture, both in relation to the vessel and the captured crew. These latter matters will not be regarded on the present issues. The views of the court in respect to that method of defense, and its effect under this state of pleading, have been sufficiently indicated in previous decisions.

The main points upon which the prosecution is resisted are (1) that the preparatory proofs and the ship's papers produced on the hearing demonstrate that the property seized

was all of it held by neutral owners, and was on transportation when seized, from one neutral port and country to another, and that no purpose or attempt was made, on the part of the claimants, to violate the blockade laid by the United States on any port of the seceded states; and (2) that no imputation of illegality attaches, by the laws of war, to any portion of the voyage, or to the acts or purposes of the claimants in concocting or conducting it. The counter positions by the libellants are, that the proceedings in employing the vessel and the ship's company, and in documenting and conducting her, are replete with indications and presumptions that the enterprize was an illicit one, set on foot and pursued with a manifest design to violate the blockade of the coast of Louisiana, and to convey to the enemy supplies essential to his necessities, and also to transport there a large quantity of the articles contraband of war, consisting of munitions and arms. The witnesses taken on board of the vessel, who are cognizant of any important facts relative to the issue, are Aymar, claiming to be her owner; Pennington, her master; Lewis, a passenger; and two of the hands, one of them being the steward, and the other a seaman—probably the mate. The last two furnished no proof respecting the fitting out or conduct of the voyage, except that they knew when the vessel left Berwick Bay for Havana that the ports of Louisiana were under blockade; and that Brown, the seaman, says that the vessel had before her capture been heading northward till about 4 p. m. on that day, and then changed her course to south-southwest, because it was thought they sighted the South Point light-house. Brown says that he saw the capturing steamer about 5 o'clock p. m. Both of these witnesses assert that they shipped for Tampico, and believed that the vessel was destined to that port. Pennington, the master of the vessel, in answer to the thirty-sixth interrogatory, evidently attempts to cover the language of the interrogatory by a strict verbal reply to its queries. He says that the light of the South Carolina ahead was discerned at 4 p. m., and was taken to be a light-house; and that, on seeing the vessel, he altered his course from northwest to south-southwest, for Tampico, which course was away from the light; that, when he bore away, he was brought nearly before the wind; and that, when captured his vessel was six degrees to the northward of her regular course from Havana to Tampico, and between 400 and 500 miles, he should think, from Tampico. Aymar, the owner, says, in answer to the same interrogatory, that he does not know the course the vessel was steering, nor how much she was off her true course, when she was captured, nor what alterations were made in her course; and that he heard the captain say his nautical instruments were out of order, and he was anxious to get on to soundings to ascertain his whereabouts. Lewis, the passenger, answers to the same interrogatory, that he understood that the vessel was, when captured, steering for Tampico, and that he does not know that her course was altered on the appearance of the capturing vessel, or to any other course than to Tampico. He says that the wind the whole time from Havana was ahead, and the weather stormy and boisterous, and such as to prevent the master from taking frequent observations, and that he seemed very much at a loss as to his course, owing to some irregularity of the chronometer. The master answers to the same interrogatory, that when he so changed his course (on coming in sight of the South Carolina) he "then thought his chronometer was right;" and he says that, "owing to the wind and weather, the vessel was obliged to be where she was" taken. To the nineteenth interrogatory, he says that he had no observation for 36 hours, and that his chronometer was between two and three minutes out of the way. It is open to remark that the witness Lewis, a citizen of New Orleans, appeared to have been suspiciously connected with the voyage. He shipped under a fictitious name, was a late officer of the United States, and had in his charge 1,200 blankets, obviously, from his account, provided for military stores, of which he represents himself to be a mere carrier, without any interest in the commodity, and apparently without any acquaintance or connexion with the owner.

Upon this exhibition of facts, the assertion, in the evidence of the owner and master, that the vessel was supposed by them to have been pursuing her direct voyage to Tampico the whole distance she ran until she was intercepted by the capturing vessel, is most inconclusive and suspicious. She left Havana September 27th, with a course northwest, and maintained the same for four days, when she was arrested. No witness intimates that the course adopted was a proper one to run from Havana to Tampico. The alleged irregularity of the chronometer may have left the master uncertain as to the distance the vessel had run, and as to how near he was to the soundings on the coast for which he was seeking; but it is not shown to have in any way affected or interfered with the due working of his compass, or with his probable knowledge whether a four-days' northwest course would lead to Tampico, or would terminate on the coast of the United States about opposite, in that direction, to the island of Cuba. Manifestly, as the voyage directly preceding this one, coming from Berwick Bay, was in about a southeast direction, the return one on a northwest line would be likely to end about where the former one commenced. The testimony of the passenger, Lewis, does not support the allegations of the master, that the weather prevented his obtaining an observation for 36 hours. He only says that the weather was so boisterous and adverse as to prevent frequent observations on the transit, which necessarily implies that some observa-

tions were actually taken. Where those were made, and at what time, and what was the result, is not disclosed in the evidence of the master, or of any other witness. Besides, as the weather had become moderate and the wind mild at the time the capturing vessel came in view, it is not made to appear but that the weather was of a like character all the period of the run, except (according to the estimate of the master) a term of 36 hours; leaving it to be presumed that during nearly two-thirds of the period of the passage of the vessel ample time and opportunity were afforded her to be navigated without wandering, for the whole distance she sailed, in a direction entirely away from the point to which she is alleged to have been destined, and almost literally back in the track pursued on her outward voyage. The absence of a logbook, unaccounted for, is matter of distrust, in time of war, as to the integrity of purpose in the outfit and operation of a trading vessel captured under equivocal and disparaging circumstances; as it is a document so usual and important, as evidence of the transactions of a ship navigating abroad, and one which so universally accompanies trading vessels employed in foreign commerce. Dana, Seaman's Friend, 145, 198. Its absence gives room for presumption that material matters have been fraudulently suppressed, and particularly where an object may exist for keeping it out of view. Entries of the casualties occurring on the voyage, of the courses and distances pursued, and of other incidents attending the navigation, are items appropriate to the log, and are always appealed to, and forcibly so, in support or refutation of testimony given by the crew in regard to navigation on board, and may become especially pertinent in prize cases in reference to voyages in face of blockaded ports. Under these considerations of the proofs given respecting the real destination of the vessel from Havana, there arise cogent suspicions that Tampico was not at the inception of the voyage intended to be its termination, and that the bills of lading, manifests, and shipping articles were simulated and falsified in that particular. It is to be observed, moreover, that the bills of lading are drawn to order or assigns, or are indorsed in blank, and would thus be as available at New Orleans as at Tampico, and no letters of instructions to any consignees are found among the ship's papers. The owner of the vessel is with the vessel, accompanying the voyage and cargo, on no avowed business; and the whole affair wears, on the proofs, the aspect of being under his sole charge and for his interests. Brown, the mate, speaks of no defect in the chronometer, or lack of observations on the voyage. He denies that the vessel changed her course because of the appearance of the capturing vessel, and alleges that the steamer was first seen an hour after the change of course. In this his testimony conflicts with that of the master, and the other witnesses make no express state-

ments on the point. All of these witnesses seem to concur in the representation that the vessel was captured out at sea, some 35 or 40 miles from the coast. It was mild weather and nighttime, and under such circumstances, a ship of war would be apt to lie close in shore while enforcing a blockade, particularly on a low coast, with numerous inlets and outlets of the character of that approached by this vessel, in order to have a readier inspection of and control over them.

The general rule of evidence in prize suits in that, in the first instance, only the ship's papers and the preparatory examinations can be adduced, and the case must ordinarily be put to hearing on these proofs. The Vigilantia, 1 C. Rob. Adm. 1. But this rule is not inflexible, and, particularly, in seizures for breach of blockade, the captors are permitted to put in affidavits contradicting the preparatory testimony as to the nearness of the captured vessel to the blockaded port, and the acts denoting an intent to evade the blockade. The Charlotte Christine, 6 C. Rob. Adm. 101. The deposition of the prize master in this case (a master's mate in the United States navy) states that he was present at the capture of the schooner, and that when first seen she was heading in shore, about half way between Timbalier Bay and the southwest pass, being about 9 miles distant when first discovered. But without regarding this deposition as of any necessity in the cause, other than as importing that the conjectural estimate of the men on board of the prize, that she was 35 or 40 miles out at sea from the coast when seized, cannot be confided in as affording a reliable assertion that she was not heading towards the coast in such vicinity as to imply a purpose to make a landing there; and laying out of view this deposition entirely, I am convinced, from the preparatory testimony itself, that the vessel was on the direct road to a blockaded port with intent to enter it, and that she changed her course only after discovering the blockading ship, and did so to avoid that ship. Had she been honestly searching for soundings, under the expectation that she was upon a lawful course, she would eagerly have put herself in communication with that ship to obtain information of the fact, and would not have veered off to sea before the wind in a direction widely divergent from, if not opposite to, the one she had been pursuing. The allegations of the witnesses examined in preparatorio were intentionally deceptive, in stating that she was steering towards Tampico when seized, because she turned suddenly and broadly off the course she had headed and pursued during her whole run, and only took that towards Tampico on the appearance of the steamer in her way immediately before her arrest, and, without attempting to speak the steamer, ran from her before the wind until chased and brought to by the guns of the latter.

I do not need to lay any stress, in the decision of the cause, as a reason for the condemnation of the vessel as enemy property, on the fact that she was owned by a domiciled trader in New Orleans at the time her voyage was undertaken thence, and when she sailed from Berwick Bay, in August, 1861; or on the fact that she was transferred also to a domiciled trader, the present claimant, in September afterwards; or on the fact that, with the knowledge of both vendor and vendee, she evaded the blockades of the ports of Louisiana on that voyage, and that her present voyage, if not a continuance of the same voyage, was the next or subsequent one in time to it; or on the consideration that the alleged transfer of the title to the vessel is not proved by the bill of sale thereof, and is not shown to have been on an actual payment therefor of any money consideration; or on the consideration that the alleged purchase, if valid in law as a transaction in a neutral territory, conferred no title to the claimant as against the United States; for I think that the evidence adequately proves that the prize vessel was despatched from Havana with the purpose of evading the blockade in the Gulf of Mexico, and of conveying and landing within an enemy port articles contraband of war, destined for the use of the enemies of the United States, then being in a state of war against this country, and that such purpose was attempted to be carried out during her whole voyage.

Several grounds of defence are taken by the claimants to the suit. One of them is that these proceedings on the capture are irregular and erroneous, because the vessel was, after seizure, appropriated to the use of the government, and has since also, without trial and condemnation, been totally destroyed, and lost to the claimant. This objection is not before the court by any form of legal issue, but is presented by way of argument. The allegation cannot in that way become the subject of adjudication and judicial remedy. If the public prosecutor has been guilty of remissness in not pursuing the condemnation of the vessel with due diligence, that delinquency may probably be corrected by libel and monition sued out on the part of the claimants; and redress for other collateral injuries, supposed to have been wrongfully committed by the captors, should be sought for by proper pleadings and further proofs. Prima facie, it will be assumed by the court on this trial that reasonable cause existed in the case for the commanding officer to take the captured vessel directly into the public service, without awaiting the usual course of a prosecution at law, and that the act is justifiable in law. Jecker v. Montgomery, 13 How. [54 U. S.] 498; Same Case, 18 How. [59 U. S.] 110. By "the port of destination," in maritime law, is meant the real one the vessel is going to, not merely the one entered on the ship's papers. Mos. Contr. War, 29. One of the chief evidences of fraud is a vessel's being out of the regular course on which she ought to be going,—her being found off the road to her destined port, as shown by her papers. Id. 98. An illusive destination is one of the most heinous falsifications of a ship's papers in time of war, and in such case the ship carrying contraband of war, and all the rest of the cargo, as being in common infected with fraud, are embraced in a common condemnation and forfeiture, when not otherwise protected by treaty stipulations. 1 Kent, Comm. 143, notes a, b.

I think the deduction from the evidence in the case is irrefragable that this vessel and all her cargo, composed in part of contraband of war, were intentionally on the road to an enemy port, and off the course to the port of destination named in the vessel's papers, and were attempting to enter an enemy port and violate the blockade thereof, and that both the vessel and her entire cargo are subject to forfeiture therefor. I am of opinion that just grounds exist, upon the proofs, for the condemnation of all the property captured and libelled in this case; but the proceedings in court against the vessel not having been regularly perfected, the decree of condemnation will be entered against the cargo alone.